**JOHN P. DANT DISTILLERY CO., Inc.**
**v. PABST et ux.**
**No. 1012.**

District Court, W. D. Kentucky,
at Louisville.
July 25, 1947.

Oldham Clarke, Allen, McElwain, Dinning & Clarke, and James Cuneo, all of Louisville, Ky., for plaintiff.

P. McKinley Harris and C. E. Schindler, all of Louisville, Ky., for defendants.

SHELBOURNE, District Judge.

In this action, John P. Dant Distillery Company, a corporation, seeks a judgment requiring specific performance by the defendants F. C. Pabst and Helen R. Pabst of an arbitration agreement dated June 21, 1945, amended June 29, 1945, and again on September 19, 1945, by conveying to plaintiff, defendants' interest in a distillery warehouse and certain machinery and equipment, and failing that relief, complainant asks that the property, real and personal, be sold and the proceeds equally divided between plaintiff and the defendants, each admittedly owning a one-half undivided interest.

The arbitration agreement provided for a sale by defendants to the plaintiff of the former's undivided one-half interest in the property for a price to be fixed by appraisers.

Plaintiff and defendants were each to appoint one appraiser, who were to fix and determine the "fair market value" of the property, which it was agreed would be the consideration for the sale. In the event the two appraisers so selected should be unable to agree, provision was made for the appointment of a third appraiser.

It was further provided that until December 31, 1945, plaintiff should use the property under an agreed rental of $1,000 per month and a further agreement to manufacture for and sell to the defendants at OPA ceiling price, 300 barrels per month of whiskey or a proportionate part thereof in the event that plaintiff was not permitted to operate the distillery for the full month.

The payment of the money rent and the furnishing of the whiskey would terminate December 31, 1945, or upon the date the sale contemplated by the agreement was consummated, whichever date was earlier. The supplement to the original agreement served only to extend the time for action by the appraisers.

Counsel for plaintiff have made a statement of facts, which counsel for defendants admit in their brief is correct; therefore I adopt, as the findings of fact herein, the statement contained in the brief of plaintiff's counsel:

## Findings of Fact

1. Dant owns a distillery at Meadowlawn, Jefferson County, Kentucky. On April 15, 1940, it leased this distillery to Charles A. Grosscurth, who assigned his lease to the Meadow Lawn Distilling Company, a corporation organized and owned equally by Grosscurth and his wife, and father, and the defendants Frank C. Pabst and Helen R. Pabst, his wife. This lease expired on April 30, 1945, and on that day, the Grosscurths and the Pabsts dissolved the Meadow Lawn Distilling Company and equally divided the assets of that corporation. During the period of the lease, the Meadow Lawn Distilling Company purchased 22½ acres of land adjoining Dant's distillery property; erected thereon a warehouse, which land and warehouse is known as the "Warehouse B. property"; and placed certain distillery equipment in Dant's Distillery.

The lease, Section 2, reads in part as follows: "In the event Lessee places new machinery and/or equipment in said leased premises he may remove the same at the expiration of the lease period or at the expiration of any renewal period provided that the buildings and improvements herein leased are not damaged by such removal and provided further that upon the removal of such machinery and/or equipment Lessee will replace such removed machinery with the machinery and/or equipment which is now located in said premises and such machinery and equipment shall be installed so that the said distillery will operate as a unit at the time Lessee delivers the leased premises back to the Lessor."

2. When the lease expired on April 30, 1945, and the Meadow Lawn Distillery Company was dissolved, the Grosscurths and the Pabsts, as its stockholders, acquired the assets of the corporation. Neither Grosscurth nor Pabst made any effort to remove their property from Dant's premises as required by the lease, and on May 1, 1945, the Grosscurths sold and conveyed to Dant their undivided one-half interest in the Warehouse B. property and the distillery equipment for $37,500.

3. Since the expiration of the lease on April 30, 1945, Dant has continuously operated its distillery. Under an agreement dated June 21, 1945, Pabst gave Dant the right to purchase Pabst's interest in the property at its fair market value to be fixed by appraisers to be appointed as provided in said agreement, and Pabst gave Dant the right to use the "Warehouse B. property" and the "distillery equipment" owned jointly by Dant and Pabst. The distillery equipment was located in the distillery owned exclusively by Dant and the Warehouse B. was located on property jointly owned by the parties hereto. Under the aforesaid possession and arbitration agreement, Pabst voluntarily executed U. S. Treasury Form 1602, consenting to the use of his undivided interest in this property through December 31, 1945. However, Pabst refused to extend his consent beyond that date, and Dant then moved this Court for a preliminary injunction requiring Pabst to execute and deliver to the U. S. Treasury Department, Alcohol Tax Unit, another consent on Form 1602, permitting Dant to continue to use Pabst's undivided one-half interest in the property involved during the pendency of this action. This motion was granted, and on December 27, 1945, this Court entered an order directing that Pabst execute said consent and requiring Dant to give bond in the penal sum of $45,000.

4. In accordance with the provisions of the aforesaid arbitration agreement, Dant named Walter C. Wagner, a registered architect and engineer of Louisville, who has specialized in distillery engineering since 1922, as its appraiser; and Pabst named as his appraiser, Leslie V. Abbott, an architect and designing engineer who has been practicing in Louisville since April 9, 1912, and who has been specializing in large industrial work, mostly distilleries. These two appraisers were given specific instructions as to their duties, with special emphasis being placed on the fact that they were to determine the "fair market value" of the Warehouse B. property and the aforesaid distillery equipment, an itemized list of which was given to each appraiser. The complete arbitration agreement was carefully read to these two appraisers, at which time counsel for the parties stressed the importance of Paragraph 1 dealing with

the naming of the arbitrators, their duties, and what they were to do in the event they could not reach an agreement, and read to them several times the following definition of "fair market value."

"The words 'fair market value' have been defined as the price at which one willing to sell would sell, and a person willing to buy would buy, both being familiar with all the facts, and the seller not being forced to sell or the buyer forced to buy."

5. These appraisers then examined the properties and made their own notes as to the value of said property. Thereafter, they met in Mr. Wagner's office, and after a discussion of the value of the various items involved, jointly dictated and agreed to the following report and award:

"September 21, 1945

Mr. P. M. Harris

and

Mr. Oldham Clarke

Louisville, Kentucky

Reference: Meadow Lawn Distilling Company, Pleasure Ridge, Kentucky

Gentlemen:

As per your request, and as per conversations at a meeting here between you and the signers of this report, separate and individual investigations were made into the values of the properties listed to us as being on the premises of the Meadow Lawn Distilling Company Incorporated and adjoining premises.

There was handed to each of us an Exhibit A, which lists certain buildings, ground and equipment and it is upon this list that the following figures are submitted:

| Description | Item No. 1 Replacement Value New | Item No. 2 Depreciated Sound Value |
|---|---|---|
| Land | $ 2,250.00 | $ 2,250.00 |
| Building | 50,695.00 | 38,275.00 |
| Equipment | 58,770.00 | 35,968.00 |
| | $111,751.00 | $76,493.00 |

While investigation has been made of the values of all equipment and buildings in connection with the list, yet we do not feel that we can make a report stating that each and every piece of said equipment is on the premises. It is our understanding that you have agreed that each individual piece of such equipment is now on the premises. Certain items have been changed or relocated and certain items such as some tanks being increased in size and capacity, have changed the actual conditions, but our report is on the equipment as per Exhibit A. The report is given in two items, No. 1, 'Replacement Value New as of Today,' and No. 2, 'Replacement Value Today, less Depreciation.'

The depreciation referred to represents a loss in comparison with new property of like kind, resultant from age, condition and remaining serviceable life.

In connection with Exhibit A which was handed to us, we note there are listed two trucks. We have not included the values of these trucks in the above amounts as, we do not feel qualified to establish a value on a used truck and suggest that you obtain these figures from some one versed in that business.

Respectfully submitted,

(signed) Leslie V. Abbott

(signed) Walter C. Wagner."

To the above statement of facts should be added a reference to a letter written by Walter C. Wagner, the appraiser selected by plaintiff, addressed to Mr. P. M. Harris, attorney for defendants and Mr. Oldham Clarke, attorney for plaintiff, at some time after the attempted appraisal between Wagner and Abbott, which letter is as follows:

"Mr. P. M. Harris, Attorney for

Frank C. Pabst and Helen R. Pabst,

Mr. Oldham Clarke, Attorney for

John P. Dant Distillery Company.

Gentlemen:

Reference is made to the award dated September 21, 1945, by me and Mr. Leslie V. Abbott as the appraisers designated under the arbitration agreement dated June 21, 1945, as amended, to whom were voluntarily submitted the questions of the fair market value of the property described in said agreement.

As stated in the award, Mr. Abbott and I did appraise and determine the value of said property and the column of figures described as 'Depreciated sound Value' was understood to be and is our determin-

ation of the "Fair Market Value" of said property.

Very truly yours,

(signed)    Walter C. Wagner"

There is no evidence of any reply being made to the letter either by defendants or their attorney, or by Mr. Abbott.

## Discussion

If the appraisers in the report made under date of September 21, 1945, determined the "fair market value" of the property, the plaintiff is entitled to a judgment requiring defendants to convey the property in accordance with the agreement of June 21, 1945.

The proof is not contradicted that plaintiff offered to pay one-half of the amount shown in the appraisers' report as representing "the depreciated sound value" of the properties. It is the contention of the defendants that the appraisers failed to determine the "fair market value" of the property and by reason of that failure, the entire purpose of the agreement failed and they now seek by counterclaim a specific performance on the part of the plaintiff "as to the rental described and as to the manufacture of whiskey for the defendants."

The testimony of the appraisers Wagner and Abbott is that they met with Counsel for plaintiff and defendants prior to their attempt to make the appraisement and that the agreement evidencing the sale of the property and the provision for the appraisement was read to them by the attorneys and their particular attention was called to the phrase in the contract "fair market value of the property" and the definition of that term was read several times as being that price which one willing to sell would receive from a person willing to buy, both being familiar with all the facts, and the seller not being forced to sell and the buyer not being forced to buy.

Mr. Wagner's testimony is that the figures shown in their report under the heading "depreciated sound value" represent the "fair market value" and that in the discussion of the values between the two appraisers pursuant to estimating and fixing the depreciated value, which is arrived at

by estimating the cost of reproducing the building new, and depreciating that amount with the amount of money which would represent wear and tear or depreciation by use or time over the years representing the age of the building, this expression was used as being the same as "fair market value."

Mr. Wagner's testimony is clear and unequivocal.

The testimony of Mr. Abbott is confusing. For instance, I quote from his testimony:

"Q.    What is your understanding of the term 'fair market value'? A.    'Fair market value' is any article that is offered for sale that a man is willing to pay and the other is willing to sell it. It couldn't be anything else in my mind.

"Q.    And is the sound depreciated value of an article necessarily the 'fair market value'? A.    I would consider that in line with the same statement."

He then said that when the report was being prepared, he and Wagner had a discussion over the question of "fair market value"; that the witness did not want to put in the report "depreciated sound value", but that after Mr. Wagner explained to the witness that his idea was that there wasn't any difference between "fair market value" and "depreciated sound value", the witness said to Wagner, "If that is your interpretation I will sign it, because so far as I am concerned, I am only interested in giving what a willing buyer would pay to a willing seller and the buyer take it, and that No. 1. column is my column."

In an effort to explain his contention that the replacement value new of $115,000 would represent the "fair market value", he gave this illustration: "A man can have a home and he can be divested of his home thru a tornado, and he would rush out and pay anything to get a house over his head."

This illustration is sufficient to reject any idea that the $115,000 representing the "replacement value new" of the property appraised, could be its present "market value" —fairly determined—because it violated a principle essential to ascertainment of "fair market value" that is that the buyer is not

impelled by any unusual circumstance except to acquire the property at its reasonable worth or value.

Both Wagner and Abbott were considered experts and were selected by the parties because of their expert knowledge and experience. Mr. Wagner had practiced the profession of architect and building engineer since 1917 and Mr. Abbott since 1912. Both had specialized since about 1922 in large industrial plants—"mostly distilleries." It is therefore to be presumed that men with the background and training of architects and designing and building engineers would approach the task of fixing the "fair market value" of property from a builder's standpoint rather than from the standpoint of a trader or investor.

I conclude as a finding of fact that the "depreciated sound value" of $74,493 was intended by the appraisers to represent "the fair market value" of the land, buildings and equipment and that that amount did represent the "fair market value" on September 21, 1945.

### Conclusions of Law

I. In the case of United States v. Miller 317 U.S. 369, 63 S.Ct. 276, 279, 87 L.Ed. 336, 147 A.L.R. 55, "just compensation" is defined as meaning the "full and perfect equivalent in money of the property taken" and should be an amount sufficient to put the seller in as good position pecuniarily as he would have occupied if his property had not been sold, and that the effort of the Courts to arrive at that value depends upon the circumstances in each particular case and no general formula can be used for that purpose. It is said in that case that; "value", "market value", and "fair market value" are descriptive terms which the Courts have adopted as best representing the concept of "market value". The Court says: "The term 'fair' hardly adds anything to the phrase 'market value', which denotes what 'it fairly may be believed that a purchaser in fair market conditions would have given', or, more concisely, 'market value fairly determined'." See also Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236.

In the case of Insurance Company of North America v. McGraw, 255 Ky. 839, 75 S.W.2d 518, a policy of insurance limited a recovery, in event of loss, to an amount not greater than three-fourths of the actual cash value of the property. The term "cash value" was there construed as being the equivalent of "market value", and as being an amount which the property would bring when offered for sale by one who desired to sell but is not compelled to do so and is bought by one who, desires to purchase, but is not compelled to buy it.

In the case of In re United States Commission, 54 App.D.C. 129, 295 F. 950, 954, the Court said: "We are of opinion that the only just and legal method of arriving at the fair value of the property * * * is to determine first the cost of reproduction based upon present values and deducting therefrom the amount of depreciation."

In the case of United States v. 3.71 Acres of Land, D.C.E.D.N.Y., 50 F.Supp. 110, 112, the Court said: "Of course, the cost of reproduction new, less depreciation, should be considered as a guide, but its weight is dependent upon what the court finds as to cost of reproduction, and depreciation, and there is a conflict in the evidence on those points."

The Court there found that the building expert had adopted a percentage of depreciation too low and rejected the valuation fixed by this witness for that reason.

There is no criticism in the present case from the plaintiff or the defendants that the sound depreciated value arrived at by the appraisers is subject to this criticism.

It is to be presumed that if the percentage of depreciation considered by the appraisers was too low or too high, the parties would have developed such objection in the evidence. No such criticism or objection appears.

■ I therefore conclude that the depreciated sound value of $76,493 is and was the "fair market value" of the land, warehouse, and the machinery on September 21, 1945.

■ II. The plaintiff's offer to pay the sum found by the appraisers as the "sound depreciated value" entitled plaintiff to a conveyance of the defendants' one-half undivided interest in the properties.

III. The plaintiff is now entitled to require the defendants to execute and deliver deed conveying their one-half undivided interest in the properties upon the payment to them of $38,246.50.

IV. Since the contract of sale provided that monthly rental, both in cash and in whiskey, should terminate upon consummation of the sale, the defendants are not entitled to receive rent on and after the tender of the consideration or the offer by plaintiff to pay the amount found by the appraisers as the "sound depreciated value" of the property.

V. Defendants are entitled to interest on the sum of $38,246.50 from October 1, 1945.

VI. Defendants' counterclaim shall be dismissed.

Judgment in accordance with the above findings of fact and conclusions of law will be submitted by counsel for plaintiff on August 1st next.